UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

20-3456

EARL BRADLEY

v.

ATTORNEY GENERAL
OF THE STATE OF DELAWARE

No 20-3456

RECEIVED
MAY 18 2021
U.S.C.A. 3rd. CIR

MOTION FOR REASONABLE ACCOMMODATION UNDER AMERICAN'S
WITH DISABILITIES ACT TO INCLUDE CUSTODIAL CARE
OF PETITIONER'S OPENING BRIEF PENDING LIFT
OF STAY

Supporting Facts

1. Petitioner had been diagnosed with life threatening osteomyelitis
in left toes December 2019. He was moved to a prison
infirmary for 6 weeks, and by policy had no access to
property or legal documents for a full 4 weeks.

2. Petitioner had been diagnosed with COVID December 2020
and required hospitalization. Petitioner's then mental
acuity was compromised, as was his access to legal
files

3. Most recently, and the impetus for this motion,
Petitioner on May 7, 2021 experienced loss of sensation
in his left hand which progressed over the following
two days to involve his entire left side. He also
is unsteady with a significant loss of balance.

4. Petitioner has not yet received a diagnosis, but
the likelihood that there is an acute central nervous
compromise is real.

5. Should Petitioner suffer further medical compromise or be hospitalized, when the brief is timely due he may not be physically able to comply.

## Opening Brief

1. Please incorporate by reference the following:
   a) District Court Traverse Filed June 19, 2019, exclusive of pages 74-84, 94-97, and appendix
   b) Motions in this court dated 11/30/20 and 12/4/20

2. Additional Brief Attached.

May 12, 2021
_____
Date signed

Earl Bradley
_____
Signature of Appellant

I declare under penalty of perjury that the foregoing is true and correct and that this motion was placed in the prison counselor's care for mailing on 5/13/21

Earl Bradley

I hereby certify that on this 13th day of May, 2021, a copy of the foregoing motion was placed in the prison counselor's care for mailing to the following address:

Elizabeth R. McFarlan, Esq
Dept of Justice
820 North French Street
Wilmington, DE 19801

Earl Bradley

a

## Judicial Bias

The Petitioner is confident that when all of the facts and circumstances are considered, a conclusion that actual bias occurred is evident. Petitioner's burden, however, is to merely prove objectively that an <u>appearance</u> of bias existed. A likelihood of actual bias (as opposed to certainty) can not be deduced from a judge's adverse rulings or a few deviations from expected legal standards. But an extraordinary assemblage of erroneous rulings forming a pattern, rulings inconsistent with the courts' jurisprudential precedent and subsequently found to be aberrant, can subjectively give an overwhelmingly strong indication of actual bias.

A good faith reliance upon the judge's honor and integrity is mainly the controlling metric.
A judge harboring a recognized prejudice might try to suppress his bias, but he is hardly likely to cry out "mea culpa." As a safeguard subjective suspicions can be addressed in the form of a judge's declaration of a "duty to sit." The reasonableness of a judge-to-judge relationship, as brother-to-brother, having a closeness worthy of recusal is substantiated in the Bradley case - not merely in theory but in reality. Three Superior Court judges and one Supreme Court Justice did recuse. Either all of these judges failed to fulfill their duty to sit, or judge-to-judge relationship is sufficient in degree.

## Legal Basis of Analysis

1. "We join our sister circuits in concluding that a showing of an appearance of bias or prejudice sufficient to permit the average citizen reasonably to question a judge's impartiality is all that must be demonstrated to compel recusal under section § 455. U.S. v. Heldt 668 F.2d 1238, 215 US App DC 206 (1981)

2. "In matters of ethics, appearance and reality often converge as one." See Offutt v. US 11 (1954) ("Justice must satisfy the appearance of justice")

3. "Given the design of the statute, then, it is wrong to impose the explicit limitations of § 455(b) upon the more extensive protections afforded by § 455(a)." Liteky v. U.S citing Liljeberg

4. "Revisions made in 1974 to statute dealing with disqualification of judge who has an interest in the case or relationship to a party require all interest or relationship and bias or prejudice grounds to be evaluated on an objective basis so that what matters is not the reality of bias or prejudice, but its appearance; recusal is required whenever impartiality might reasonably be questioned." Liteky v. U.S. 510 U.S. 540 (1994) 28 U.S.C.A § 455(a)

Please incorporate Traverse signed 6/13/19 beginning on page 85 (Ground 7)

## District Judge's Misapprehension

The District Judge abused his discretion when he did not so much as address the plainly and clearly cited law in Petitioner's Traverse. The District Judge, as did the State, misapprehended established federal law as determined by the United States Supreme Court.

The District Judge reverted to an 1821 prohibition standard against truely and objective presumed bias, the "old" §455. The "new" §455, established by Congress in 1974, requires disqualification when impartiality might reasonably be questioned, or where there is an appearance of bias. The Judge failed to consider "all the surrounding facts and circumstances" as he was required to do by Supreme Court directive.

"Actual bias" is inherently subjective, thus not likely to be objectively provable. It can be surreptitious by intent, but it can also be innocently unrecognized.

Any presumed duty for a defendant to prove "actual bias" is unreasonable and unfair. Such a burden would be the equivalent of an obligation to "prove a negative," that is prove that impartiality did not exist.

The Petitioner's averment that Judge Carpenter had created an erroneous "fact" from outside of evidence was of major significance.

The fictitious creation — that Bradley was known to videotape his patients — later was relied upon to enable the Judge's key legal theory regarding video search justification. It is objectively incontrovertible that no such notion of videotaping was ever mentioned in the warrant nor subsequently supported by any testimony.

Prejudice resulted: but for the "video" fiction presented as fact, video evidence would have been suppressed.

An unbiased judge would not have interfered in the adversarial process, attempting to rehabilitate an illegal search. Judge Carpenter was a zealous advocate for the prosecution at multiple junctures in the trial process. Examples such as provided above support the conclusion of actual bias.

The District Judge trivialized the pivotal and prejudicial videotaping of patients assumption. The Judge confounded the issue by offering alternate syntax which in no way changed the clearly conveyed essence.

The Petitioner will next present objective considerations regarding appearance of bias at trial and on appeal.

## Trial Judge

Three judges recused before Judge Carpenter accepted the Superior Court post. It was commonly known in the legal community the reason for these recusals, the reason being that a certain judge was the grandfather of an alleged victim. The identity of this grandfather was carefully unspoken. FN

Ironicly the judge not recusing had by appearance a much closer relationship to the grandfather judge than did the three, yet never declared a duty to sit, relying upon the common discretion which would allow the public to remain shielded from disclosure.

Judge Carpenter had been a law school classmate, graduating in the same year as the grandfather judge. The two were peers in the truest sense of the word — both members of the same State judiciary and both of similar if not the same age. Moreover, due to their advanced ages the relationship had longevity. The referenced judge being the grandfather of an alleged victim creates a reasonable assumption that he would champion a conviction. Of course his friend, the trial judge, would prefer to convict for the grandfather's sake. Reasonably, at least by appearance, there was a foregone conclusion that an acquital was not an option. The motivation for bias was objectively present. Indeed Judge Carpenter's

questionable rulings favoring the prosecution
were pervasive through out the proceedings."
With regard to "all the facts and circumstances,
a fair appraisal of this issue necessitates a
global review of the trial process and the
numerous infractions involved, not merely
a select few issues.
( Incidentally, the public defender for Bradley
was also a member of the judges' law school
graduating class, a truth stranger than
fiction regarding the appearance of bias
in the face of so many trial irregularities. )


## Justice on Appeal — State Supreme Court

Justice Randy Holland recused and was replaced
by Vice-Chancellor Leo Strine. As disclosed
by the District Judge, the Chancellor was the
previously mentioned grandfather judge.
By appearance Strine had a closer relationship
to the Chancellor than did Justice Holland.
The injury to Bradley losing the integrity
and brilliance of Holland had added the insult
of a replacement by Strine. By appearance Strine
had at minimum a responsibility to proclaim
his "duty to sit," for no doubt the entire legal
community had raised eyebrows. Indeed Bradley
at one point motioned that Strine declare his
duty to sit, but the motion remained unanswered.

Justice Strine sanctimoniously pontificated regarding "duty to sit" in Reeder V. DE Dept of Insurance 2006 WL 510067. Strine himself referenced "appearance of impropriety," as opposed to impropriety itself, as the controlling question. Strine went out of his way to treat in great detail that which not a true motion, but merely the semblance of a motion to recuse. Yet when Bradley actually did motion that he declare a duty to sit, Strine remained silent.

Objectively Justice Strine did rule against Bradley on the same on-point issue on which Wheeler prevailed. (Cited in Traverse). The unequal protection under the law as revealed in a Wheeler — Bradley contrast attests to actual bias.

By default, with appearance being as it was, Strine had a duty to recuse in the absence of a duty to sit proclamation.

FN   The Petitioner did not to his memory or knowledge ever disclose the specific identity of the grandfather judge, nor to his recollection had it ever been publicly revealed by any party. This was intentional out of respect for the Chancelor's privacy. The volunteered disclosure, "in charge of Chancery Court," as presented in parentheses, now makes the fact public record.

*Bracy v. Gramley*, 520 U.S. 899 (1997)

Rather than so much as addressing the Petitioner's commanding Supreme Court citation from *Liteky v. U.S.*, the District Judge instead elected to dubiously conflate the issue by using a similar but different citation taken out of context from the *Bracey* case, a case off-point from Bradley's case.

The context of *Bracy* surrounding "actual bias" has a focus on an exception to a rule in federal habeas court whereby <u>further discovery</u> could not take place. In Bradley further discovery was not sought. Rather the context in Bradley was "appearance of bias" regarding a judge at trial or on appeal.

"Actual bias" and "appearance of bias" are different entities. Different legal applications might emphasize one rather than the other. A case may involve either one, or both. A case with objectively proven actual bias may be totally without any appearance of bias, and, conversly, a case with a stark appearance of bias might not involve any actual bias whatsoever.

In the contrast of *Bracy* and Bradley, the Supreme Court's words in *Bracy* are instructive. The Court wrote "The facts of this case are, happily, not the stuff of typical judicial disqualification disputes." Having none of the Bradley "stuff," the District judge was remiss in citing this case irrelevant to the issues in Bradley.

The Bracy Court, however, did include an instruction pertinent to Bradley, a point ignored by the District Judge. "Most questions concerning judge's qualifications to hear a case ... are answered by common law, statute, or professional standards of bench and bar." Clearly the ABA Codes of Judicial Conduct reflect the "appearance of bias" standard.

Even in Bracy, in fact, a proof of actual bias was not a "sine qua non requirement." [FN] Yet Bradley is deemed by the District Judge responsible to overcome such a high hurdle not enforced in Bracy. Again, in constructive effect, Bradley was being held responsible to prove a negative — that impartiality did not exist.

> [FN] Bracy Court: "Although petitioner may be unable to obtain evidence sufficient to support a finding of actual judicial bias in his trial, he has made a sufficient showing to establish 'good cause' for discovery."

# FOURTH AMENDMENT VIOLATIONS AND STONE v. POWELL EXCEPTIONS

Stone v. Powell is a broadly applied U.S. Supreme Court case despite its widely acknowledged lack of clarity. Each of the Circuit Courts has evolved with its own set of guidelines, and those of the 3rd Circuit are to be respected by the Petitioner herein.

Petitioner has identified at least a dozen fundamental and unreasonable Fourth Amendment violations,[FN1] each issue with its own set of circumstances, each a contributor to the cumulative effect of an unfair trial process. While its possible that Stone may bar federal redress of some, the unique set of circumstances involved in others may justify full consideration of those particular issues. The District Court's overly broad sweep in the name of Stone compels this rather exhaustive brief.

Many, if not all, of Petitioner's Fourth Amendment violation complaints now fall within the Sixth Amendment's purview and involve ineffective assistance of counsel (IAC). The 3rd Circuit has acknowledged these fall outside of the Stone bar.

An erroneous state determination of a Fourth Amendment claim can involve a mistake in fact, law, or some combination of both. The Stone

b

Court referenced the high court's decision in Townsend v. Sain 372 US 293 (1963) which provided some guidelines regarding "full and fair," but those are mainly helpful with regard to issues of fact and not issues of law. An erroneous state determination of law with regard to a 4th Amendment violation claim is a different issue, mainly lacking any Stone guidance. With regard to issues of law, the main controling parameters include the "spirit of the law" as derived from other high court opinions, common sense, and universal standards.

One conundrum exists whereby a fundamental incongruence in Constitutional rights might easily present itself. A true 4th Amendment violation could be barred by Stone while in corollary that same aggrieved defendant loses his "Constitutional right" to suppression of evidence. Such conflict is eloquently expressed in dissent in O'Berry v. Wainwright 546 F. 2d 1204 (5th cir 1977). There it was acknowledged that the exclusionary rule is "a judicially created remedy designed to safeguard 4th Amendment rights generally through its deterrent effect." The dissent justice wrote "Whatever the precise significance of their unexplained limbo between remedies that are a 'necessary incident' of a constitutional guarantee of individual liberty and those imposed under the Court's supervisory powers,... Stone never the less

C

made quite plain that defendants are still
entitled to have state courts exclude evidence
seized in violation of the 4th Amendment,
a requirement that must ultimately be derived
from the Constitution. The fact that in some
sense the exclusionary rule is not 'a personal
constitutional right' simply does not begin
to explain in what circumstances federal
habeas proceedings will remain unavailable
when the state courts, in enforcing a procedural
rule, refuse to consider the 'remedy' Stone
leaves intact." Not merely an entry on the
Stone dissent wish list, it was the Stone case
itself which expressed the viability of the
exclusionary rule. It is in this context that
the U.S. Supreme Court's promise in Illinois
v. Rodriguez will later be discussed.

Gamble v. Oklahoma 583 F.2d 1161 (10th cir 1978)
This case was cited by the 3rd Circuit in Gilmore
v. Marks 799 F.2d 51 (3rd cir 1986) and has
special significance in Bradley. In Gamble
"Based upon the lack of consideration by the
Oklahoma state Courts of Petitioner's arguments
in reliance upon a U.S. Supreme Court case
almost directly on point, this Court finds that
any opportunities which the State of Oklahoma
might have provided to litigate this 4th Amendment
claim were not 'fair.'" The Court concluded
"Thus a federal court is not precluded from

considering 4th Amendment claims in habeas corpus proceedings where the State Court wilfully refuses to apply the correct and controlling Constitutional standards." Likewise to the Gamble case, in Bradley there was on-point relevance to a U.S. Supreme Court case, namely Maryland v. Garrison. (This issue is identified with the Maryland v Garrison case and is discussed below.)

<u>Gilmore v. Marks</u> 799 F. 2d 51 (3rd Cir 1986) This case law cites the above mentioned Gamble case with full agreement on a fundamental principle, albeit a principle not held in all Circuits. This Petitioner relies upon the 3rd Circuit's expressed declaration in Gilmore which parallels the expression in Gamble. "We do not forclose the possibility that a state failure to give at least colorable application of the correct 4th Amendment constitutional standard may indicate that there has been no opportunity for full and fair consideration, thereby precluding application of Stone v. Powell)." Likewise the Gamble Court opined: "... to raise or otherwise present 4th Amendment claim, it also includes full and fair evidentiary hearing, and contemplates recognition and at least colorable application of correct 4th Amendment Constitutional standards." In the "Maryland v Garrison" issue discussed below it will be noted that the trial judge in Bradley in fact had full

"recognition", yet he elected to not apply
the correct 4th Amendment constitutional standard.

## Mistake in Law

In O'Berry v. Wainwright 546 F.2d 1204 (5th cir 1977)
the Court concluded that: "Thus Townsend technically
applies only in determining whether a State Court
has granted a petitioner a full and fair evidentiary
hearing, a hearing limited to findings of fact."
The Court also stated: "Townsend emphasizes
that although 'the district judge may, where the
state court has reliably found the relevant facts,
defer to the State Court's finding of fact, he may
not defer to its finding of law.' It is the district
judge's duty to apply the applicable federal law
to the State court fact findings independently."
"The state conclusions of law may not be given
binding weight on habeas. That was settled in
Brown v. Allen 344 U.S 443 ... 73 S.ct ...

## Absense of Any Determination, Factual or Legal

It is axiomatic that a full and fair consideration
is impossible should consideration itself be withheld.
In O'Berry v. Wainwright at FN12: "There cannot
even be the semblance of a full and fair hearing
unless the state court actually reached and decided
the issues of fact tendered by the defendant."
"Thus, if no express finding of fact have been made
by the State Court, the District Court must initially
determine whether the State Court has impliedly
found material facts."

"No relevant findings have been made unless the state court decided the constitutional claim tendered by the defendant on the merits..."

## Petitioner's On-Point Maryland v. Garrison Issue "

In O'Berry v. Wainwright an objectionable scenario is described. "The federal court cannot exclude the possibility that the trial judge believed facts which showed deprivation of constitutional rights and yet (erroneously) concluded that relief should be denied." With regard to Petitioner's "Maryland v. Garrison" based claim, it is transparent that the Bradley trial judge did believe facts which showed deprivation of constitutional rights and yet concluded that relief should be denied. It was the trial judge himself who cited Maryland v Garrison, contrasting it as a legal search as opposed to the search in Bradley which was illegal. The two cases were on-point in that they both involved the police confronting newly discovered situations involving warrant language and original expectations, both with situations which had to be addressed on their respective "time lines." In both Bradley and Maryland v. Garrison, police discovered a discrepancy between the warrant's directive language and discovered circumstances. The Maryland v Garrison police adopted certain precautions which were mitigating or corrective,

"but for" such steps, then evidence would have had to have been suppressed. In Bradley there were no corrective actions, thus "but for" had no application. In contrast to Maryland v. Garrison, clearly in Bradley the evidence should have been suppressed. Petitioner agrees that with regard to this issue the factual finding was "full and fair." The facts are undisputed. Not only did the trial judge unveil the factual basis, he clearly had "recognition" of the significance. (see Gamble v. OK above) Devoid of any legal basis the trial judge simply elected to not give a colorable application of correct 4th Amendment constitutional law.

Maryland v. Garrison 480 U.S. 79 (1987): "Moreover, as the officers recognized, they were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." The detective in the Bradley search was objectively aware of the "risk." Testimony in the evidentiary hearing described officers' doubts and the need for a call to the Deputy Attorney General. The detective testified that he had not been aware of the existence of Building C. Yet on the relevant timeline, before

h

the search commenced, Building C was clearly
visible in stark contrast to the other buildings.
Moreover the detective had been on notice to look
behind the main office for a building, and that
would have been Building C. Choosing a roadside
vantage point, of course the detective did
not see Building C, precisely because it
was where it was meant to be, obscured
behind the main office. The 3rd Circuit standard
in U.S. v. Ritter of what an officer "should
have known" focuses responsibility on the
detective who should have known 1) that he had
a duty to look behind the main office, and 2) that
his chosen vantage point was narrow and restrictive,
having no view of what was behind the main office.
In U.S. v. Ritter 416 F.3d 256 the 3rd Circuit
wrote "The Garrison Court's ultimate directive
remains salient: The officers' conduct and the
limits of the search [are] based on the information
available as the search proceeds." In Bradley
it was before the search began that the "information
available" had been fully disclosed — four buildings
each clearly seen in stark contrast to the others.
In Ritter the 3rd Circuit wrote "Accordingly,
as directed by Garrison, we must evaluate the
officers' conduct in carrying out the warrant."
The officers' conduct was described in the trial
judge's evidentiary hearing opinion:
        "The reasonable and professional course

of action would have been to secure
the premises until another warrant was
obtained or at least until the Deputy Attorney
General arrived to give them further legal
guidance. Instead, of taking such logical and
appropriate steps, the officers made the
misguided assumptions that have now put
them in the difficult position of attempting
to justify their conduct. At best, the
officers' actions reflect a calvalier
attitude that is simply unjustified in
light of the significance of the case and
the office that they were searching. "

The recognized 4th Amendment violation did not
receive any Chapman harmless error analysis.
The U.S. Supreme Court's express guarantees
provided in Illinois v. Rodriguez 497 U.S 177 (1990)
include:

   [6] " Trial right of the exclusionary rule, where
   it applies, assures defendant that no evidence
   seized in violation of Fourth Amendment will
   be introduced at his trial unless he consents "
   [13] " To satisfy 'reasonableness' requirement
   of the Fourth Amendment what is generally demanded
   of the many factual determinations that must
   regularly be made by agents of government,
   whether the magistrate issuing warrant,
   police officer executing warrant, or police
   officer conducting search or seizure under one

of the exceptions to warrant requirement,
is not that they always be correct, but
that they always be reasonable."

Relying upon his own preference or judgement,
the trial judge abused discretion when he failed
to use the correct legal standard and wilfully
chose to ignore established federal law as
determined by the U.S. Supreme Court.

The "always be reasonable" words of Illinois
v. Rodriguez's promise were blatantly
unfulfilled, as conspicuously evident
in the trial judge's narrative provided above.

Please incorporate the "Ground 12 issue" of
the June 2019 traverse beginning on page 106.


## NAMES ISSUE

At the suppression of evidence hearing Detective Spillan
gave sworn testimony which was conclusive of a
most fundamental 4th Amendment violation.
The trial court had the duty and purpose to make
a factual determination in response to this raised
claim. The State Supreme Court likewise had a
duty upon review on appeal. The prime facie
factual account was incontravertible, thus explaining
the most likely reason why the courts chose to
remain silent on the issue. The record (by omission)
confirms that no court has rendered opinion on

K

this issue, not the trial court judge twice
(during trial process and later during PCR process),
and not the State Supreme Court on appeal.
The issue was identified by defense at the
suppression hearing, but perhaps ineffectively.
For whatever reason to this date no resolution
through court opinion has been effected, and
the federal District court was likewise deficient.
The issue should now be addressed de novo by
this Appeals Court.
As stated in Gamble v Oklahoma, "opportunity for
full and fair litigation in state court, so as to
prevent consideration of Fourth Amendment claim
in federal habeas corpus proceedings, involves
more than opportunity for evidentiary hearing."
"Opportunity ... includes, but is not limited to
procedural opportunity ... it also includes full and
fair evidentiary hearing and at least colorable application
of correct Fourth Amendment constitutional standards."
Bradley did have the procedural opportunity to
raise this issue in an evidentiary hearing.
Yet what might be a colorable application of correct
4th Amendment constitutional standards was never
tested or determined. Neither correct nor incorrect
standards can be assumed since the record is
void of judicial opinion either way. Full and fair
litigation axiomatically presumes that the
litigation actually occured. "Fullness" is a
nullity when silence substitutes for litigation.

Without so much as the "semblance of a full and
fair hearing (see O'Berry v. Wainwright FN12 above),
"fairness" in the litigation cannot have any
legitimate basis of support.

Aside from arguments precluding a Stone bar, a
3rd Circuit principle is inferred in Cox v.
Horn 757 F. 3d 113 (2014). With regard to
the Court's opinion on "equitable ruling," it appears
that the Court found objectionable the notion
that an IAC claim might never be heard
in any court, "state or federal."

In the PCR process, Attorney Patrick Collins
explained that effective presentation of one
of the Detective Spillan violations does not preclude
IAC of another. Collins brought up the "Names
issue" and the fact that no court had ever
addressed it.


Without any judiciary contest otherwise, Petitioner
declares that Det. Spillan had effected an overly
broad and general search. He opened files while
clueless of who they belonged to. He had no tool
for the benefit of targeted children identification.
He did not so much as have a remote expectation
that any file would likely belong to any specific
child, and thousands of children were in the
same category. Spillan had no means of identifying one
of the warrant designated children, and conversely he
had no means of identifying and eliminating any of the
thousands of children outside the small group of about 8,

Issue Based Upon Doe v. Grody

The trial judge erroneously used an adopted "common sense" mantra to effect a result antithetic of the Doe v. Grody Court's intent and purpose. Rather than support "the touchstone" of a warrant as the Doe Court advocated, the trial judge took selected words out of context which he employed as his own "magic wand," transforming the warrant into an amorphous entity subject to any interpretation the trial judge chose to make citing "common sense,"

The trial judge's conclusions may appear "reasonable." Afterall they parallel the distinguished Doe Court's <u>dissent</u>. But was the rendered opinion a colorable application of correct federal law? The answer is clearly no since it is the majority opinion which prevails. An assemblage deficiencies "forgiven in the name of common sense" are compounded. This supports a conclusion of "cumulative error." FN

FN  The magistrate targeted children's medical files without provided nexus to criminal activity. Specific description of what within the medical file was relevant and within scope was not given. It was not at all reasonable for the magistrate to assign his dependence upon a detective having no medical qualifications to vet medical records. The detective was not qualified to discern that which might be the criminal activity sought but never identified in specific description. Only a general search seeks an unidentified target, and moreover it is within the Medical Board's purview to so investigate. The staleness issues of the affidavit were not vetted.
Building B:
1). had no identified probable cause
2). was not particularly described
3). was not listed as a specific location to be searched, nor incorporated by reference anywhere in the warrant.

## Ground 13   Doe v. Groody/Groh v Ramirez

This Ground is predicated upon the State courts' decisions both contrary to and unreasonable application of established federal law as determined by the U.S. Supreme Court in Groh v. Ramirez.


### Introduction

The ground is objectively incontrovertible. The trial judge cited federal law in Doe v. Groody incorrectly. Bradley's defense counsel was ineffective, being remiss in their incumbent responsibility to know the law regarding this fundamental and key judicially cited law. Had the judicial citing been properly counter-argued, the result would have been favorable to Bradley, dispositively compelling that evidence be suppressed. A case with on-point relevance is:

U.S. v. Graves  F.Supp.2d  2013  WL 3215171
West Headnote [11] "All lawyers that represent criminal defendants are expected to know the laws applicable to their client's defense."
The Court ordered briefing addressing the decisions in Groh v. Ramirez and Doe v. Groody. The Court was confident in its conviction of the anticipated result, stating "Had defense counsel moved to suppress the evidence because the search warrants did not identify or incorporate by reference the items to be seized, that motion would have been granted." Likewise in Bradley - where no outbuilding of any description was correctly identified or incorporated by reference. This removed any outbuilding from contention, thus Bradley's motion "would have been granted."

Bradley's attorneys' ignorance of the law caused them to take the judge's bait and argue "white" versus "checkerboard."

The State could find no better counter-argument to this ground than that cogently articulated in the Doe dissent.

The wile which had been successful at trial and on appeal will no longer be effective as it is now herein debunked.

112

*O*

The Third Circuit Doe v. Groody case, with its firm reliance upon
the U.S. Supreme Court's ruling in Groh v. Ramirez, should have
been controlling and dispositive in the Bradley adjudication.
Judge Carpenter, however, cited the Doe v. Groody Court extracting
a sentence which lost context when it was removed from the words
which followed. Carpenter failed to read the case with the same
"common sense" he quoted from the case and championed. Using the
"common sense" mantra he conformed the constitution to his liking.

"To be sure, a warrant must be read in a common sense,
non-technical fashion."

The Doe v. Groody dissent would have been thrilled if this simple
sentence would have been allowed to stand in control. The
shattering crash comes in the sentence which follows.

"But it may not be read in a way that violates its fundamental
purposes."

The former sentence which Carpenter extracted standing alone
negates the majority's position. Carpenter adopts the position of
the minority. The two sentences together, as they were intended,
denoted a crucial exception to any laxity acceptable in the name
of "common sense." The key word which Carpenter ignored at his
convenience was "but."

Had Carpenter read the whole Doe case and comprehended its true
significance, he would have realized it fundamentally supported

Bradley. If he was aware, but chose to use the out of context
extracted sentence as an enabler, shame on him for his
surreptitious subterfuge, and shame on the ineffective defense
counsel. The defense counsel was obligated to know the law,
especially law key to the case and erroneously cited. The case
had dispositive jaws of victory from which Bradley's attorneys
snatched defeat.

In the Bradley warrant a phrase "to include white outbuilding"
exists in the "name" portion. It exists identically in a 2008
failed warrant application. Carpenter deemed the phrase as
sufficient in particularly describing a location to be searched
in the light of "common sense" reading. Carpenter made a
fundamental error of established federal law as determined by the
U.S. Supreme Court in Groh v. Ramirez, while clearly it can be
argued that the particularity of description was inadequate to put
a checkerboard major building within scope, adequacy is moot since
an inclusion in the "name" portion is in-eligible constituionally,
as explained in Doe v. Groody relying upon Groh v. Ramirez. The
"to include" phrase was not incorporated by reference anywhere in
the affidavit/warrant. No outbuilding, white, checkerboard, or
otherwise, was constitutionally included within the warrant's scope.
While the warrant should be read in a non-technical fashion, one
technical demand is without compromise — that is the demand that
the "touchstone of the warrant" remain uncompromised.
To understand the Doe Court's objective-directive, one need only read
the dissent's frustration. "The majority takes the position that the
only relevant entry is the one in the box entitled 'SPECIFIC DESCRIPTION
OF PREMISE AND/OR PERSONS TO BE SEARCHED'." In Bradley, the "white

outbuilding" was not listed in the correct box and thus was not a
"relevant entry."

In Doe there was mention of a complaint that the block or box itself
was too small or of limited space. Perhaps the majority sympathized,
but they offered no legal concession. The minority made no bones
about it, writing: "... the majority employs a technical and legalistic
method of interpretation that is the antithesis of the 'common sense
and realistic' approach that is appropriate." Bradley invokes the
majority's approach, demanding technical conformity in the reading of
the warrant specifically with regard to the legitimate particularly
described locations to be searched. The minority's endorsed and Carpenter
adopted "non-technical" approach can not constitutionally prevail.
Judge Carpenter abused discretion when he "broadened the warrant by
language in the affidavit." (quote from Doe) Moreover, the language
in the affidavit which Carpenter relied upon merely stated that a
father had seen Bradley carry a child toward an outbuilding behind the
main office. The affidavit statement was inadequate to establish
probable cause, and in any case there was no "incorporation."

Two Doe v. Groody extractions:
1) "A particular description is the touchstone of a warrant," and
2) "... it to be clearly established that unless a search warrant
specifically incorporates an affidavit, the scope of the warrant may
not be broadened by language in that affidavit."

Citations

Doe v. Groody   361 f.3d 232   (Third Circuit 2004)

Groh v. Ramirez   540 U.S. 551   (2004)

R

## Lex, Lies, and Videotape

On the pretext that a video could exist as part of a medical record, the scope of the Bradley warrant was judicially broadened — despite the fact that even the mere existence of video had never been alleged concerning the 8 targeted children. The afiant not only never requested video as an item to be seized, he never so much as hinted at any relevance.

An incontrovertable legal argument impeaches the widening of the breadth of the search to include video, and an argument which is factually rooted likewise disqualifies video citing AEDPA guidelines. In any case a "colorable application" of correct law is the 3rd Circuit adopted standard.

A "colorable" application of correct law, while it may be erroneous, must be reasonable. Without reasonableness the most fundamental requirement of the Fourth Amendment would be violated. Any proposal of an unreasonable application of law, correct or colorable, totally lacks merit. One cannot so much as mimic correct Fourth Amendment constitutional law without certain elements, lest it be unreasonable, without the sin qua non elements an application can neither be correct nor colorable, and certainly not reasonable. The touchstone and fundamental principles upon which the Fourth Amendment was predicated

5.

must be preserved, even if only in form but allowing for flexibility in substance. Video, in order to be legitimately targeted in a warrant, must be supported with compliance to non-negotiable constitutional demands. These include:

1. Video must be supported by _probable cause_ as set forth within the 4 corners of the affidavit,

2. Video must have a _nexus_ to the alleged criminal behavior.

3. Video, being a general entity, must be limited in breadth by the warrant.

4. Video, more than probable cause of existence, must have probable cause with a substantial basis for concluding it would uncover evidence of _wrongdoing_.
   U.S. v. Crespo-Rios 623 F. Supp 2d 198
   citing Illinois v. Gates 462 U.S. 213 103 S. Ct.
   alternatively:
   "...those seeking the warrant must demonstrate to the magistrate the probable cause to believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense. Dalia v. U.S. 441 U.S. 238 1979 (citing Warden v. Hayden)

5. Video must be particularly described.

6. Video location likewise requires probable cause and particular description.

7. Video must be sought as directed by a _magistrate_.

The Bradley warrant did not target video. Any assertion that it did target video, constructively or otherwise, must be consistant with the above listed constitutional demands. Addressing each of the above numbers in Kind) Video in Bradley:

1. was not probable cause supported with in the 4 corners of the warrant/Affidavit.

2. had no nexus to any of the 8 targeted children and no nexus to any alleged criminal behavior

3. arguendo had video been supported, the breadth of the search would have been limited to the 8 targeted children using a search methodology respecting the privacy of any video of those children outside of the 8. Again, Spillan had no discriminating means of child identification.

4. No basis existed to conclude that video would uncover evidence of wrongdoing. There was no demonstration to the magistrate of probable cause to believe that any video might aid in a particular conviction for a particular offense. Indeed there was no identified "particular offense" common to all of the 8 targeted children. There was no "one size fits all" offense, so for each of the 8 children any video or its use would have required individualized attention.

5. Video was not mentioned let alone particularly described.

6. A probable cause based location for video was not provided. Consistent with any belief that video would be a component of a medical file would require warrant direction to exclusively look in such locations, for any video outside of the medical record context would clearly be beyond scope and off limits, as was the video spillen discovered on a private computer in a private location devoid of any medical trappings.

7. Replacing and usurping the magistrate's direction, the trial judge merely supplied supposition and assumed magistrate agreement.

In lieu of the above listed deficiencies, the trial judge offered:

1) a video title time frame applicable to only one of the eight targeted children, yet so general in scope as to apply to thousands of children, and

2) a reference to his own created fact from outside of evidence that "it was not uncommon for Dr. Bradley to videotape or photograph his patients."

Should a time frame encompassing a vast array of possibilities be deemed and championed as a reasonable limiting and controlling metric,

V

he who holds such belief is a devout advocate of the general warrant.

The trial judge's reference to and reliance on his own created fiction regarding Bradley videotaping patients. There was no true legal significance, only illusion through sophistry. A conclusion that Bradley videotaped his patients, even if true, was not specific to the 8 targeted patients. The entire practice shared equal likelihood of being videotaped. A search targeting generic video would thus need to be deemed general. While not of true legal significance, the trial judge's attempt to make "an unreasonable determination of the facts" (AEDPA) sheds light on the totality of the circumstances lack of reasonability, and joins in part in the cumulative effect depriving Bradley of a fair trial process.

The District Judge took issue with Petitioner's paraphrasing, "was known to videotape his patients." The judge supplied the correct quote — "The affidavit set forth information received from other physicians and office staff that it was not uncommon for Dr. Bradley to videotape his patients." While engaged in nit-picking with regard to exact wording, the District Judge swallowed hook, line and sinker the trial judge's defective logic. The judge neglected fundamental law and neglected to do a most simple fact checking. He only needed to read the warrant/Affidavit to discern the absence of video.

In addition to my "pro se" disadvantage, my access to legal research is reduced to virtually zero. The library has been closed due to COVID.

Realizing that the Pennsylvania Supreme Court is not the ultimate authority, it is in the 3rd Circuit and I did have access to a "Criminal News" article which supports at minimum the reasonableness of my arguments. Extractions include:

1) "Pennsylvania requires that not only must the warrant describe the place to be searched and items to be seized with specificity but also requires that the warrant 'be supported by probable cause to believe that the items sought will provide evidence of a crime'."

2) "To show probable cause, there must be a 'specific nexus between the items to be searched and seized and the suspected crime committed'."

3) "There has to be a 'link' in the affidavit to show probable cause."

4) "Probable cause can only be assessed by the facts in the affidavit, no other evidence can be considered."

5) "The Court said that without probable cause the warrant was essentially overbroad already

Citing Commonwealth v Johnson   Pa. LEXIS 5517 (2020)

Buildings "B" and "C"

Petitioner believes that he has presented an argument of merit that neither "B" nor "C" were warrant supported.

Arguendo, if the Court permits an assumption that the search of one of the two was permitted, still the search of the other must be reconciled. Both "B" and "C" were invaded, at minimum demonstrating a methodology employed which was unbridled by the warrant. Prima facie a 4th Amendment infraction did occur. The Courts erroneously deemed the violation de facto moot, without a chapman declaration of "harmless." The courts contend that despite any violation, police are excused by virtue of the "fact" no evidence from Building "C" was used at trial. The factual account is false. In fact evidence derived from the invasion of "C" was used. Intangible evidence in the form of knowledge impeached "C" from contention with "B" for the coveted distinction as "the "outbuilding with medical use. Of course the invasion of "B" yielded no medical records and "B" lack of medical trappings should have likewise disqualified it, still it conformed to a single structure. Had only "B" been invaded, upon conformation of no medical use attention would have naturally shifted to "C", this requiring a new warrant.

Despite being pro se, having reviewed countless 4th Amendment cases, I am confident in the conclusions I draw. Unreasonable search and seizure is constitutionally illegal. No where does the Constitution restrict the guarantee to only those instances whereby tangible evidence is physically removed.

The Delaware State Judiciary has rewritten federal 4th Amendment law. Most dissapointing is the federal enabling by the District Court which abetted the subversion.

The search of "C" was unfruitful with regard to any interpretation of what the warrant directed as its targets. This is true whether a narrow and conforming to Constitutional standard is employed, or an overly broad interpretation with merely tenuous support is used. Unfruitful with regard to physical evidence that is. The absence of physical evidence from "C" underscores the total lack of probable cause for a building merely mentioned by a "father." The magistrate never directed a discovery of the use of "C." While "C"'s descriptive specificity conforms with the warrant's language, the State and Court's found it all the more necessary to diminish and belittle any "C" viability allowing it to compete with "B." Any probable cause favoring "C" had to be quashed, thus the search of "C" was undermined.

Earl Bradley   CJIS # 45266
Cheshire Correctional Institution
900 Highland Ave
Cheshire, CT   06410

RECEIVED
MAY 1 8 2021
U.S.C.A. 3rd CIR

The Clerk
The United
for the

21 400
601 M
Philadel,

Legal Mail